Edith W. Jones, Transferee of the Estate of Lester Earl Jones v. Commissioner.
Jones v. Commissioner
Docket No. 3136-65.
United States Tax Court
T.C. Memo 1966-209; 1966 Tax Ct. Memo LEXIS 74; 25 T.C.M. (CCH) 1066; T.C.M. (RIA) 66209; September 26, 1966
*74 Glen E. Fuller, 15 E. 4th St., Salt Lake City, Utah, for the petitioner. Roger A. Pott, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in the estate tax of Leslie Earl Jones in the amount of $24,030.19. The parties agree that petitioner is liable personally and as a transferee for the assessment and collection of any deficiency in estate tax determined herein, plus interest as provided by law, due from the estate of Leslie Earl Jones. The issue for decision is to determine the fair market value of two parcels of dry (nonirrigated) farm land which are located in the southwesterly portion of Salt Lake County, Utah. An issue raised in the pleadings regarding the value of two additional parcels of similarly situated real property was conceded by petitioner. In her petition, petitioner did not challenge the validity of respondent's determination with regard to certain other items raised in his notice of deficiency. Findings of Fact Some of the facts have been stipulated and as stipulated are so found. Petitioner is the widow of Leslie Earl Jones, deceased (hereinafter referred to as decedent), who *75 died on August 24, 1962. She filed a Federal estate tax return (Form 706) as the surviving wife and surviving joint tenant of decedent on April 20, 1963, with the district director of internal revenue for the District of Utah, Salt Lake City, Utah. Prior to decedent's death, all of his assets, including real property, were held by him in joint tenancy with petitioner. As of the date of decedent's death, petitioner received all of the assets that were included in his gross estate for Federal estate tax purposes. Decedent's estate is insolvent and lacks sufficient assets to pay any deficiency which may be determined in Federal estate tax. Petitioner concedes that she is liable both personally and as a transferee for the assessment and payment of any deficiency in estate tax that may be determined, plus interest as provided by law, due from decedent's estate. Decedent operated a crop farm on three noncontiguous tracts [1] of land (hereinafter referred to as parcels #1, #2, and #3) located in the southwesterly portion of Salt Lake County, Utah. All improvements (including decedent's residence and farm buildings) and farm machinery were located on parcel #1, a tract containing 31 *76 acres of irrigated farm land. [2] Petitioner and her sons continued farm operations on parcels #1, #2, and #3 after decedent's death. A fourth noncontiguous tract of land [3] (hereinafter referred to as parcel #4), located in close proximity to parcel #1, was purchased by decedent in November 1961 and had been leased out to a third party since that date. [4] The operation of parcel #4 was wholly unrelated to the operation of parcels #1, #2, and #3. The parcels of real property in issue (parcels #2 and #3) consist of 160 acres and 200 acres, respectively, of unimproved, dry (nonirrigated) farm land. The area in which both parcels *77 are located is sparsely populated, either flat or gently rolling land, and, for the most part, used for dry farming, which comprises the planting of fall, winter, and spring grains such as wheat, barley, and rye. Both parcels #2 and #3 are within the zoning ordinance of Salt Lake County, Utah, and are now and at the time of decedent's death classified under Agricultural Zone "A-2." Parcel #2 is situated approximately 20 miles to the southwest of the central business district of Salt Lake City, and in an area generally described as lying between West Jordan, Utah, and Copperton, Utah. The southeasterly corner of parcel #2 is located approximately 250 feet north of an oiled state highway, referred to as the Bingham Highway, at 5600 West Street, the latter being a dirt lane extending north along the parcel's east property line. To secure access to parcel #2, the owners thereof must cross the property of a third party. Parcel #2 is square in shape and relatively level. The soil is of good quality and its workability for farming is satisfactory. The average alternate year crop production is approximately 22 bushels of wheat per acre. Parcel #3 is approximately 6 miles south of parcel *78 #2. It is located immediately south of, and is bordered by, 11800 South Street, an asphalt surfaced road. Parcel #3 lies to the northeast of, and in close proximity to, the town of Herriman. [5] The soil of parcel #3 is poor and difficult to farm. Its average alternate year crop production is approximately 12 bushels of wheat per acre. Parcel #3 is diagonally opposite a county garbage dump. Electricity and telephone facilities are generally available in the area of parcel #3 but sewer, culinary water, and natural gas facilities are not available. The highest possible use in terms of income production to which both parcels could be put, as of August 24, 1962, was farming. Moreover, as of August 1962 it could not be foreseen that there would occur any change in use of the land in the general vicinity of parcels #2 and #3 from that of farming within the next 10 or 20 years. Sales in the area of parcel #2 reflect considerable speculative activity. This activity was caused in part, at least initially, by Boeing Aircraft's purchase *79 in the 1950's of an option to buy several hundred acres of land near parcel #2. However, Boeing Aircraft did not exercise its option. This latter fact became known in the area by 1959 or 1960. As a consequence, the price for land at that time in the general area dropped slightly for a brief period but rose sharply again thereafter. The following sales of land, situated in the general vicinity of parcel #2, occurred in the years between 1959 and 1962: (1) On August 25, 1959, Earl D. Wood and James H. Wood each sold 53.33 acres, or approximately 106 acres in all, of dry farm land, located about three-quarters of a mile due north of parcel #2, to Grant Valentine. The sales price was $26,500 for each parcel, or $53,000 for the entire acreage, and approximately $500 per acre. (2) In September 1959, James H. and Alice P. Wood sold 79 acres of dry farm land located north and east of parcel #2 for $47,400 (or $600 per acre) to Lynn H. Coombs, who acted as trustee for an investment group. This property is comparable except for size to parcel #2. (3) On December 28, 1959, Elmer Jensen sold four separate 20-acre parcels, totaling 80 acres, to the Jordan School District for $40,000, or *80 $500 per acre. Two parcels have frontage on oiled highways but the other two parcels have no frontage on streets or highways. These four parcels are comparable to the properties in issue except for size and, in two cases, accessibility. (4) In April 1960, Henry Schmidt traded property (409 acres) which he owned for a Montana ranch owned by Max Lowe, who in turn sold the property to William Hodson. The property is located on the old Bingham Highway, approximately one mile south of parcel #2. The sales price was $125,000, or approximately $305 per acre. (5) On December 29, 1961, Elmer Jensen sold to the Dumont Corporation a 20-acre parcel, fronting on a paved road, for $10,000, or $500 per acre. This parcel, located in close proximity to the north and east of parcel #2, is comparable to parcel #2 except in size. Dumont Corporation resold 10 acres of the above-said parcel 60 days or so after the date of the original sale for $10,000, or $1,000 an acre. (6) On February 7, 1962, the Grow West Corporation sold a 160-acre parcel of dry farm land, located approximately one mile northeast of parcel #2, to the Farr West Land Company [6] for $112,000, or $700 per acre. This parcel fronts *81 on the same dirt road as parcel #2 and is comparable to parcel #2. Grow West Corporation had purchased the above-said property for $80,000, or $500 per acre, seven months prior to its sale to Farr West Land Company. (7) On February 28, 1962, Violet J. Price sold a 40-acre parcel located 1320 feet west of parcel #2 to the Farr West Land Company for $26,000, or $650 per acre. This property is comparable to parcel #2 except it is smaller and less accessible. (8) On February 28, 1962, Roy Burdette Price sold a 40-acre parcel adjacent to the west property line of parcel #2 to the Farr West Land Company for $26,000, or $650 per acre. This parcel is comparable to parcel #2 except that it is smaller and less accessible. The Farr West Land Company acquired, in the period between 1960 and 1962, approximately 2,680 acres comparable to the subject properties at an average purchase price of $640 per acre. The following sales of land, situated in the general vicinity of parcel #3, occurred in the years between 1959 and 1962: (1) On April 18, 1959, Morris T. *82 and Ruby J. Wood sold to Paul and Carol Rubey for $107,000, or approximately $147 per acre, 728 acres of dry farm land, located approximately one-half mile due south and southwest of parcel #3. The foregoing sale (hereinafter referred to as the Wood-Rubey sale) became the subject of extensive litigation. (2) In the summer of 1962, Arthur W. Crane sold to Alonso Freeman for a sum not in excess of $4,500, or a maximum of approximately $56 per acre, 80 acres of dry, flat farm land located approximately one mile south of Herriman and less than three miles southwest of parcel #3. The acreage is accessible by means of a dirt road. (This sale is hereinafter referred to as the Crane property sale.) Upon purchase, the buyers of the parcels above described generally leased them out to farmers. The leases typically yielded the lessors a return of approximately 25 percent to 33 percent of the crops raised upon the leased properties. The Farr West Land Company never made any attempt to purchase any of decedent's four parcels. However, decedent approached a representative of the Farr West Land Company to see if said company would purchase parcel #2 for a sum of $600 per acre (or some sum in *83 excess of that amount). Respondent engaged C. Francis Solomon, Jr. (hereinafter referred to as Solomon), an experienced appraiser of real property, to evaluate parcels #2 and #3. In his appraisal report, Solomon valued parcel #2 at $541 per acre and parcel #3 at $391 per acre. In determining the values of the subject properties, Solomon relied upon sales prices of what he considered comparable properties. In estimating the value of parcel #3, Solomon relied mainly upon sales prices of property located 3 to 7 miles north of parcel #3 in the general vicinity of parcel #2. Petitioner engaged Thomas I. Baum (hereinafter referred to as Baum), also an experienced appraiser of real property, who prepared an appraisal report for the explicit purpose of determining the fair market value of the real property in decedent's estate as of the date of his death. Baum valued parcel #2 at $375 per acre and parcel #3 at $100 per acre. He believed that the fair market value of each subject property could not be determined separately but only in terms of their relationship to the decedent's farm unit which, he maintained, was comprised of parcels #1, #2, #3, and #4. In the Federal estate tax return *84 of decedent's estate, parcel #2 was reported as having a value of $24,000 (or $150 per acre) and parcel #3 was reported as having a value of $20,000 (or $100 per acre). In his notice of deficiency, respondent determined that the fair market values as of the date of decedent's death of parcels #2 and #3 were $96,000 (or $600 per acre) and $110,000 (or $550 per acre), respectively. Opinion The sole issue for decision relates to the valuation for estate tax purposes of two noncontiguous parcels of dry farm land (parcels #2 and #3) located approximately 20 miles and 25 or 26 miles, respectively, from the central business district of Salt Lake City, Utah. These two parcels, in conjunction with a third noncontiguous tract of land (parcel #1) have been utilized for farming operations over a period of years, first by decedent and, since his death, by his widow and sons. Since property included in the gross estate is to be returned for tax purposes at its value upon the date of the decedent's death, our task is to determine the actual value of the two parcels in issue as of August 24, 1962, the date of decedent's death. The value to be ascertained is the market or sales value of the *85 property. Petitioner contends that the values assigned by respondent to the parcels in issue are erroneous because such values (1) have been determined by considering each parcel as a functionally-discrete unit and (2) are based upon what petitioner styles "speculative prices." With respect to her first contention, petitioner maintains that the fair market values of parcels #2 and #3 must be adduced in terms of their functional relationship to decedent's total farming operation. In support of this theory, petitioner argues that a separate sale of parcels #2 or #3 would destroy the economic unit (parcels #1, #2, and #3) for farming purposes and cause a reduction in the market value of the remaining units. We do not pass upon the validity of petitioner's "unity" theory since the record fails to support its applicability in the instant case. First, there is not sufficient evidence to establish petitioner's underlying premise - to wit, a separate sale of parcel #2 or #3 would effect a diminution in value of the remaining parcels. Second, for the following reasons, we are not convinced that the parcels should be regarded as an integrated farming unit: (1) In (a) the appraisal report *86 submitted by petitioner and (b) the opening statement of petitioner's counsel, it is frequently stated that parcels #1, #2, #3, and #4 comprised an integrated farming unit. Petitioner's son testified to the same on trial. However, on cross-examination, he stated that parcel #4 had been purchased by decedent in November 1961 and had been leased out to a third party from that time until, at least, the time of decedent's death. Also, on cross-examination, petitioner's son admitted that the fourth parcel could not in any way be considered part of the total farm unit. (2) Petitioner's son further testified that farming parcel #3 was a venture of uncertain profitability. (3) Decedent attempted to sell parcel #2 to the Farr West Land Co. for $600 an acre. Taking all the above factors in account, we believe that the fair market values of parcels #2 and #3 should be determined exclusive of one another and of any other parcels owned by decedent. Respondent's evaluation was, therefore, correct, at least, in this respect. The chief element in determining the fair market value of land is sales of similar lands at or about the time in question and in the immediate vicinity, provided such *87 sales have been in the open market and were not compulsory. As we have shown in our Findings of Fact, a viable market for real property existed during the two years preceding decedent's death. Respondent and his appraiser rely primarily upon the prices at which properties in the area of parcel #2 were bought and sold to establish the fair market values of both parcels #2 and #3 at the date of decedent's death. Petitioner makes the general objection to respondent's reliance on the aforesaid sales prices in evaluating parcels #2 and #3 on the grounds that such sales prices were "speculative." By describing such sales prices as speculative, we gather that petitioner considers the prices paid were simply too high in terms of what she considers to be the limitations, use, and potential of those properties. However, we may not disregard an established market and prevailing prices therein even though we ourselves or petitioner would not choose to pay the going market rate. Moreover, there is nothing in the record to indicate that the sales described in our Findings of Fact were anything other than bona fide or at arm's length. We believe that sales in the vicinity of parcel #2 provide *88 an accurate yardstrick for measuring the value of parcel #2 as of August 24, 1962. We do not consider it necessary to discuss individually or in detail each individual tract sold in order to illustrate its comparability with parcel #2; suffice it to say, we have considered all the tracts in this respect. Taking into consideration (1) the prices paid for land comparable to parcel #2 and (2) the estimate of value made by respondent's appraiser, we believe that the sum of $550 per acre represents the fair market value of parcel #2 as of the date of decedent's death. Evaluating parcel #3 presents a more onerous task because of the lack of sales activity in its immediate area. Respondent and his appraiser rely upon the sales of property situated in the locale of parcel #2 in determining the value of parcel #3 at $391 per acre. Such other properties sold were located at a distance of 3 to 7 miles from parcel #3. We do not consider that respondent's approach to evaluating parcel #3 is entirely valid. Moreover, respondent and his appraiser fail to give proper consideration to the Crane property sale, which property was located less than 3 miles south of parcel #3. Taking into account (1) *89 the location of parcel #3, (2) the Crane property sale, and (3) the other property sales set out in our Findings of Fact (but only those lying closest to parcel #3), [7] we conclude that the fair market value of parcel #3 was $150 per acre on August 24, 1962. Decision will be entered under Rule 50. Footnotes
1. All three parcels were included in decedent's estate for Federal estate tax purposes and, prior to his death, were jointly owned with petitioner. ↩
2. The value of parcel #1 was stipulated to by the parties for Federal estate tax purposes prior to the trial proceeding herein.↩
3. Parcel #4 was included in decedent's estate for Federal estate tax purposes and, prior to decedent's death, was jointly owned with petitioner. ↩
4. The value of parcel #4 was stipulated to for Federal estate tax purposes by the parties prior to the trial proceeding herein.↩
5. Herriman is a small community of several hundred persons. It has undergone very limited growth and lacks the facilities necessary to a growing community.↩
6. The Farr West Land Company is an investment group comprised of individuals residing in the general area of Salt Lake City.↩
7. In considering the Wood-Rubey sale, we have taken into consideration the extensive litigation that followed the execution of the sales contract therein.↩